UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

REBECCA ILLENBERG,

                        Plaintiff,

            -against-

CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

                        Defendant.

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 11/20/2014

13-CV-09016 (AT)(SN)

REPORT AND
RECOMMENDATION

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE ANALISA TORRES:

Plaintiff Rebecca Illenberg brings this action pursuant to Section 205(g) of the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final determination

of the Commissioner of Social Security (the "Commissioner") denying her application for Social

Security Disability Insurance benefits ("DIB") and Supplemental Security Income ("SSI")

(collectively, "disability benefits"). Illenberg moved, and the Commissioner cross-moved, for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Because I conclude that the administrative law judge ("ALJ") did not commit legal error

and substantial evidence supports his determination, I recommend that the Commissioner's

motion for judgment on the pleadings be GRANTED, and the plaintiff's motion be DENIED.

## PROCEDURAL BACKGROUND

On August 25, 2006, Illenberg filed concurrent applications for DIB and SSI benefits,

alleging an onset date for her disability of January 15, 2005. On May 9, 2007, the Social Security

Administration ("SSA") denied her applications, and on June 19, 2007, Illenberg requested a hearing before an ALJ. On February 26, 2009, Illenberg appeared before ALJ Arthur Patane. On April 23, 2009, which was after Illenberg's insured status expired on June 30, 2008, the ALJ issued a decision denying both applications. On February 24, 2011, the Appeals Council denied Illenberg's request for review of the ALJ's decision. Then, on November 29, 2011, the Appeals Council set aside its February 24, 2011 decision to consider additional information but ultimately denied review, thereby rendering the decision of the Commissioner final.

On June 8, 2009, Illenberg filed another application for DIB, alleging an onset date for her disability of January 15, 2005, due to bipolar disorder, manic depressive disorder, and anxiety disorder. (R. 20, 277, 298.) The SSA denied her application, and Illenberg appealed, requesting a hearing before an ALJ. On May 24, 2011, Illenberg and her attorney appeared before ALJ Roberto Lebron. The ALJ adjourned the hearing, however, to consider additional medical evidence not yet in his possession. In the interim, on January 10, 2012, Illenberg protectively filed another application for SSI benefits, alleging an onset date for her disability of August 22, 2006, due to bipolar disorder, manic depressive disorder, anxiety disorder, and herniated discs in her back. Because Illenberg's DIB application was pending, the SSI application was accelerated to the hearing level so that the applications could be consolidated. On February 17, 2012, Illenberg and her attorney appeared before ALJ Michael A. Rodriguez. The ALJ issued a decision on May 8, 2012, denying Illenberg's applications. First, the ALJ found that *res judicata* barred Illenberg's application for DIB because the ALJ's April 23, 2009 denial of DIB came after the last date for which Illenberg was insured, June 30, 2008.[1] Second,

---

[1] Because June 30, 2008 was the last date that Illenberg was insured, Illenberg had to establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

the ALJ denied Illenberg's application for SSI on the ground that she was not disabled. On September 24, 2013, the Appeals Council denied Illenberg's request for review of the ALJ's decision, thereby rendering the decision of the Commissioner final.

On December 19, 2013, Illenberg, through counsel, filed this action challenging only the denial of her SSI claim. On December 30, 2013, the Honorable Allison Torres referred Illenberg's case to my docket for a report and recommendation. On June 12, 2014, Illenberg filed a motion for judgment on the pleadings with supporting memorandum of law. On July 14, 2014, the Commissioner filed a cross-motion for judgment on the pleadings with supporting memorandum of law. On August 20, 2014, the Court issued an Order directing the parties to file an opposition or reply brief by August 25, 2014, otherwise the motions would be considered fully briefed. The parties filed no other opposition or reply briefs, and the motions are considered fully briefed.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

## I.     Non-Medical Evidence

Illenberg was born on October 24, 1980, and was 31 years old at the time of her hearing on February 17, 2012. She graduated from high school in 1998. Illenberg has four children. Illenberg's mother has custody of her two oldest children, a daughter and son; her third child, a son, was adopted when he was six months old; and her fourth child, a daughter, lives with her and her fiancé (the child's father), John Best. (R. 650.)

3

In an SSA Disability Report filed in June or July 2009,[2] Illenberg reported that her ability to work is limited by bipolar disorder, manic depressive disorder, and anxiety disorder. (R. 298.) The disorders cause her to "get upset at people," "have a short attention span," and make her unable to "concentrate." (Id.) Before she stopped working on August 22, 2006, Illenberg had been a cashier at florist, retail and restaurant establishments. (R. 299.)

## II.   Relevant Medical History

### A.   Psychiatric Impairments

#### 1.   St. Luke's Cornwall Hospital

On September 20, 2005, Illenberg reported to the emergency room of St. Luke's Cornwall Hospital in Newburgh, New York with a "slight headache" and reported feeling depressed. (R. 365.) She had no prior psychiatric history and was on no medications. (R. 368.) Her affect was restricted, she was easily tearful, but her speech was coherent. (Id.) Illenberg, then 24 years old, reported that she had fleeting thoughts of cutting her wrists, but, realizing the irrationality of those thoughts, came to the emergency room for help. (Id.) She had been feeling depressed since giving up her eight-month-old son for adoption six months ago.[3] (Id.) She reported feeling "overwhelmed by [illegible] stressors" and from "having financial problems." (Id.) At the time, she was working part-time at a florist shop while her fiancé took care of their two-year-old child. (Id.) She denied having suicidal ideation or any intent or plan to hurt herself. (Id.) The doctor's impression was "adjustment [illegible] with depressive mood." (Id.) Illenberg

---

[2] The Disability Report – Adult, Form SSA-3368, initially appears undated. (R. 297-304.) However, the form that follows it, Disability Report – Field Office, Form SSA-3367, states that the "protective filing date" was June 8, 2009 and the interviewer who completed the form did so on June 17, 2009. (R. 305-07.) In addition, Illenberg completed the Work Activity Report – Employee on July 10, 2009. (R. 311-16.)

[3] On one page of the St. Luke's Cornwall Hospital admission paperwork for September 20, 2005, it states that Illenberg reported that she gave up her eight-month-old son six months ago. (R. 365.) On a later page, it states that she gave up her six-month-old son two months ago. (R. 368.)

did not meet the criteria for involuntary admission, and the doctor recommended that she be discharged but referred to therapy and medication management. (R. 267.) She was prescribed Zoloft (50 mg/day). (Id.)

### 2.      Dr. Mark Cerbone, St. Francis Hospital

On October 5, 2006, Illenberg saw Dr. Mark Cerbone for an Emergency Psychiatric Evaluation at St. Francis Hospital in Poughkeepsie, New York. (R. 373.) Dr. Cerbone noted that "the patient has a strong family history of bipolar disorder" and "experiences unstable moods, primarily describing episodes of depression, irritability, 'flying off the handle,' a propensity towards distraught, tense mood states and difficulty sleeping." (Id.) Illenberg reported that she took 50 mg of Zoloft a day for one to two months with no apparent benefit so stopped taking it. (Id.) She came to the hospital because of recent "intense irritability" and "mood swings." (Id.) Dr. Cerbone described her mental status as "youthful [ ], tense, concerned, coherent, no threats, no hallucinations or delusions. Reflects on circumstances and collaborates in treatment decisions." (Id.) Dr. Cerbone diagnosed Illenberg on Axis I[4] with "mood disorder nos, rule out bipolar spectrum,"[5] "deferred" on Axis II, "none noted" on Axis III, access to mental health for Axis IV, and a Global Assessment of Functioning ("GAF")[6] score of 60 on Axis V. (Id.)

---

[4] The Diagnostic and Statistical Manual of Mental Disorders uses a multiaxial assessment system in which each axis refers to a different domain of information that may help the clinician plan treatment and predict outcome. Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention. Axis II refers to personality disorders and mental retardation. Axis III refers to general medical conditions. Axis IV refers to psychosocial and environmental problems. Axis V refers to the Global Assessment of Functioning. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 25 (4th ed. 1994) ("DSM-IV").

[5] "Mood Disorders NOS," No. 296.90, refers to "Mood Disorder Not Otherwise Specified." See DSM-IV at 375. It is included in the DSM to code disorders "with mood symptoms that do not meet the criteria for any specific Mood Disorder and in which it is difficult to choose between Depressive Disorder Not Otherwise Specified and Bipolar Disorder Not Otherwise Specified." Id.

[6] "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing DSM–IV, at 34 (4th ed. rev. 2000)). A GAF between 51 and 60 indicates

Illenberg was to follow up with outpatient clinic services and was "offered Seroquel as an aid to sleep 400 mg per tab, ½ to 3 tabs p.o. at bedtime prn insomnia and Lamictal 25 mg p.o. every a.m., titrate up to 100 mg p.o. every a.m. by increasing 25 mg every 7 days." (Id.)

### 3.        Dr. Frank Musolino, Lexington Center for Recovery

Illenberg was treated at the Lexington Center for Recovery ("Lexington") from June 27, 2007 through August 13, 2009. (R. 381.) She was referred to Lexington by Turning Point, where she had just finished 28 days of rehabilitation for marijuana and crack addiction. (R. 369, 386-87.) Illenberg reported that before rehab, she used crack for one year, marijuana for two years, and occasionally drank alcohol. (R. 385.) She smoked half a pack of cigarettes a day. (R. 388-89.) She noted she found it hard to keep a job, and her last job had been in January/February doing marketing for Liberty Taxes. (R. 388.) She reported that her family (mother, father, and brother) has a history of mental illness, and that she has had physically and sexually abusive boyfriends. (Id.) She reported being raped at least twenty times in the past and, as a result, has panic attacks when a male figure is behind her. (R. 393.) She reported that she has a history of depression and had previously been diagnosed with bipolar disorder, PTSD, and having had a "nervous breakdown." (R. 386, 389, 393.)

At Lexington, Dr. Frank Musolino diagnosed Illenberg on Axis I with Cocaine Dependence (304.20), Cannabis Abuse (305.20) and Mood Disorder NOS (296.90). (R. 393.) He gave no diagnosis under Axis II, noted Illenberg's diagnosis of Hepatitis C and her being five months pregnant under Axis III, and listed social environment, health care services, economic,

---

"[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or social functioning (e.g., few friends, conflicts with peers or co-workers." <u>DSM-IV</u> 30-32. The Fifth Edition of the DSM has discarded the use of GAF Scores. <u>See</u> Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 16 (5th ed. 2013) ("DSM-V"). The DSM IV, however, was in effect at the time of Illenberg's treatment.

occupational, and problems with primary support group as stressors under Axis IV. (R. 386, 395.) He reported Illenberg's GAF as 60.[7] (R. 395.) He described Illenberg as "pleasant, normal gait and posture . . . , good eye contact, friendly, answers all questions relevantly." (R. 394.) From June 2007 through August 2009, Dr. Musolino prescribed her a combination of BuSpar, Trazodone, and Abilify. (R. 392-93, 396.) On August 13, 2009, Illenberg reported having back pain due to herniated discs and that she might be having surgery. (R. 396.)

### 4.    Hudson Valley Mental Health Clinic

From November 24, 2009 through January 9, 2012, Illenberg received mental health services at Hudson Valley Mental Health ("Hudson Valley"). (R. 642-678). Illenberg was referred to Hudson Valley upon completion of treatment at Lexington. (R. 649-51.) On December 22, 2009, Dr. Deborah Chung completed a psychiatric evaluation of Illenberg. (Id.) Illenberg reported that her oldest daughter's and older sons' fathers were sexually and physically abusive. (R. 650.) She reported being sober (from marijuana and crack abuse) for one year and that she attended Alcohols Anonymous ("AA") and Narcotics Anonymous ("NA"). She reported overdosing two times, once in her early twenties and once four and a half years ago. Her medical history included Hepatitis C and herniated disks from a car accident. Illenberg's chief complaint was, "I'm depressed with anxiety. I'm not able to sleep. I'm nervous around people. I feel worthless and guilty. I want to continue to take medications and therapy." (R. 649.) With regards to her mental status, Dr. Chung described Illenberg:

> Patient is a 29 year old moderately heavy set Caucasian female who looks to be [her] stated age. She is casually attired, but somewhat sloppy with poor hygiene. She is cooperative and polite. She is distracted with 2 year old daughter. Affect is tense and anxious with depressed mood. Patient reports panic attacks in a crowd. Speech is

---

[7] These doctor notes are nearly illegible. They appear to record a GAF of "60," but could also state a GAF of "50," which would indicate more serious impairment. See R. 395.

> coherent and relevant with no apparent thought disorders. Patient
> seems to be isolated with limited interaction. Patient denies any
> hallucinatory experiences or suicidal/homicidal ideas. She is
> oriented to 3 spheres. Memory for recent and remote events is intact.
> Patient seems to have low average intelligence. Insight and
> judgment are limited.

(R. 650.) Dr. Chung diagnosed Illenberg on Axis I with Major Depressive Disorder Single Episode (296.20), Panic Disorder with Agoraphobia (300.21), Cocaine Dependence in Early Remission (304.23), and Cannabis Abuse in Early Remission (305.23); on Axis II with "deferred" (799.9); on Axis III with Hepatitis C and herniated discs (causing back problems subsequent to a car accident); on Axis IV with support group, social, and occupational stressors; and on Axis V with a GAF of 50.[8] (R. 650, 563-68.)

Dr. Chung saw Illenberg again and wrote reports on September 24, 2010 (R. 557-62), January 18, 2011 (R. 549-56), February 25, 2011 (R. 647-48), April 14, 2011 (R. 541-48), July 14, 2011 (R. 671-78), October 12, 2011 (R. 663-70), and January 9, 2012 (R. 655-62). Throughout this time, Dr. Chung prescribed Illenberg with a combination of Abilify, Ambien, BuSpar, Remeron, Lunesta, and Klonopin. (R. 642-46.) Throughout this period, Illenberg's clinical diagnosis remained the same, except that her Axis IV diagnosis listed economic, educational, and occupational stressors as priorities beginning on September 24, 2010. (R. 561.) Throughout this period, the reports stated that "patient is struggling with health problems that have gone undiagnosed and has missed several appointments due to this. She is actively involved in her church and will begin helping people who struggle with drug addiction as she once did. [She h]as custody of one child and finds this difficult when she is not feeling well," although the child's

---

[8] A GAF between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV 30-32.

father is helpful. (R. 541, 549, 663, 671.) On January 18, 2011, Illenberg reported that she had

seen a back surgeon and plans to have surgery in early 2011. (R. 551.) On February 25, 2011,

Illenberg reported that on a scale of 1-10 (with 10 being the most intense), her back and leg pain

was a 9. (R. 647.) Thereafter, Illenberg reported that she had back surgery in March, 2011 (R.

673.) On October 12, 2011 and January 9, 2012, Illenberg committed to applying for ACCES-VR[9]

and following through with recommendations made by ACCES-VR. (R. 665, 657.) On January 9,

2012, Illenberg also reported being depressed because her grandmother died, and although she still

had difficulty going out in crowded places, she had gone out over the holidays. (R. 655.)

### B.    Physical Impairments

#### 1.    Dr. Kenneth Desa

Illenberg saw Dr. Kenneth Desa as her primary care physician between April 23, 2009

and March 15, 2010. (R. 459-75.) During that time, Illenberg was 5'4", weighed between 190-

217 lbs., and smoked cigarettes. (Id.) At visits on May 28, 2009 and December 18, 2009,

Illenberg denied having headaches or having difficulty sleeping. (R. 460, 470.) On October 13,

2009, she denied having little interest or pleasure in doing things in the last two weeks and

denied feeling down, depressed, or hopeless. (R. 462.) On November 2, 2009, she reported that

she was hospitalized for six days when one side of her lungs collapsed in October 2009. (R. 464.)

#### 2.    Dr. Steven Celestin, Community Health, Hudson River Health Care, Inc.

Illenberg saw Dr. Steven Celestin as her primary care physician between December 29,

2009 and May 3, 2011. (R. 473-74, 508-31.) Illenberg confirmed that she had not used cocaine,

---

[9] ACCES-VR (Adult Career and Continuing Education Services – Vocational Rehabilitation) is run by the New York State Education Department and offers a range of services to assist individuals with disabilities to obtain and maintain employment. See http://www.acces.nysed.gov.

marijuana, and alcohol since April 2007. (R. 513.) At her July 12, 2010 visit, Illenberg complained of back pain, noted that she will continue her neurological and pain management with Dr. Jindal, and indicated that she was applying for a disability parking sticker due to difficulty walking. (R. 515-16.) Between July 23, 2010 and August 24, 2010, Illenberg saw Dr. Celestin three times due to acute stomach pain. (R. 517-24). On November 30, 2010, Illenberg reported pain of 8-8.5 on a scale of 1-10 in her back, and on February 3, 2011, Dr. Celestin provided her medical clearance for disc replacement surgery (scheduled for March 1, 2011). (R. 525-28.) At her May 3, 2011 follow-up appointment after disc surgery, she reported that she had some pain while "walking long distances or exerting" herself but the pain is much improved overall. (R. 530.) She again reported that she had not suffered from little interest or pleasure in doing things in the last two weeks and had not been feeling down, depressed, or hopeless. (Id.) She also expressed an interest in trying Chantix to quit smoking. (Id.)

### 3.   Dr. Ronald Scheinzeit, Orthopedic Associates of Dutchess County, P.C.

On November 6, 2007, Illenberg saw Dr. Ronald Scheinzeit of Orthopedic Associates of Dutchess County, P.C. for neck and lower back pain caused by a car accident she was in on July 13, 2007. (R. 375.) At the time, Illenberg was 26 years old, weighed 182 pounds and was five months pregnant. (Id.) She reported no pain down her arms or legs and had no tenderness in her neck and back. (Id.) "Her lower back has a little more tenderness centrally but she moves both hips, knees and ankles, and has pulse, sensation and motor function." (Id.) Her ability as to "straight leg raising" was negative. (Id.) Dr. Scheinzeit diagnosed her with a cervical sprain and lumbosacral strain. (Id.) On December 18, 2007, Dr. Scheinzeit saw Illenberg again and found no neurological changes in her status. (R. 377.) After giving birth on February 19, 2008, Illenberg visited Dr. Scheinzeit on April 15, 2008. (R. 379.) Her neck and lower back symptoms

remained the same with no pain down her arms and legs, and no numbness or weakness. (Id.)
She was able to "move her upper extremities and lower extremities" and was ambulatory. (Id.)
Dr. Scheinzeit diagnosed her with persistent and chronic cervical strain and lumbar strain and
recommended physical therapy. (Id.)

### 4.    Dr. Surinder Jindal, Neurologist

Illenberg saw Dr. Surinder Jindal for her back pain beginning on May 19, 2009 through
October 4, 2011.[10] (R. 429-58). On May 19, 2009, Illenberg complained of "cervical pain,
lumbosacral pain, left arm pain and numbness, [] paresthesis of the hands," and "of tingling and
numbness sensation." (R. 451.) She was prescribed B6 50 mg a day and Relafen 500 mg twice a
day as needed. (R. 440.) On June 18, 2009, Illenberg was reevaluated and reported that the pain
was more frequent and bothersome, including: "hand numbness," "radiating pain from the neck,"
and pain which interfered with her sleep and daily activities. (R. 448.) Dr. Jindal recommended
that Illenberg get an MRI, although he believed surgery was not necessary, and prescribed
Lodine 300 mg twice a day, Zanaflex 2mg at nighttime, vitamin B6, and Darvocet as needed. (R.
449.) On July 9, 2009, a MRI revealed electrophysiological evidence of left L5-SI radiculopathy.
Dr. Jindal recommended continuing "conservative treatment," including trigger point injections
in various spinal regions. (R. 447.) On October 22, 2009, Illenberg complained that her back pain
was more frequent with some stiffness, although the trigger point injections relieved some
pressure and burning sensations, making her more comfortable in daily activities. (R. 445.) Her
straight leg raising was 70 degrees. (Id.) Dr. Jindal continued her "conservative pain
management," which then included Lodine, replacing Darvocet with Ultracet and Ultram, four

---

[10] She saw Dr. Jindal on May 19, 2009, June 18, 2009, July 9, 2009, August 4, 2009, August 25, 2009,
October 22, 2009, November 17, 2009, and December 15, 2009, January 12, 2010, February 9, 2010,
March 9, 2010, April 6, 2010, August 9, 2011, and October 4, 2011.

trigger point injections in various spinal regions, and stretching. (Id.) On November 17, 2009 (R. 443), December 15, 2009 (R. 437), January 12, 2010 (R. 435), February 9, 2010 (R. 433), March 9, 2010 (R. 431), April 6, 2010 (R. 429), August 9, 2011 (R. 634), and October 4, 2011 (R. 633), Illenberg's pain and symptoms persisted and Dr. Jindal continued his "conservative pain management" recommendations.[11] Dr. Jindal also recommended weight loss. (R. 633.)

### 5.    New York Spine Surgery & Rehabilitation Medicine, PLLC

Illenberg was referred by Dr. Jindal to Dr. Kenneth K. Hansraj at New York Spine Surgery & Rehabilitation Medicine, PLLC between July 2009 and November 2009. (R. 571-87.) On August 18, 2009, Illenberg reported "constant neck and back pain," numbness in hands and weakness in legs and arms, "spending a lot [of] usual waking hours lying down," and having pain during the night. (R. 579.) On a typical day, she reported being able to walk less than one New York City block and although walking elsewhere (shopping for groceries, walking around the house or in the mall) was possible, she was always in pain. (R. 581.) Dr. Hansraj recommended conservative treatment. (R. 582, 587.)

### 6.    Dr. Ezriel Kornel, Brain and Spine Surgeons of New York

On October 6, 2010, Dr. Ezriel Kornel met with Illenberg to address her back pain. (R. 488.) Illenberg reported that "her pain is worse with prolonged sitting, prolonged standing, or prolonged walking and she feels very limited now and even has difficulty lifting her 2 ½ year-old daughter." (Id.) Dr. Kornel noted that Illenberg "tried extensive conservative treatment over the years including physical therapy and chiropractic without any benefit." (Id.) Dr. Kornel

---

[11] On November 17, 2009, Illenberg's straight leg raising was 60 degrees bilaterally and Dr. Jindal replaced Ultracet with Vicodin. (R. 433.) On February 9, 2010, Illenberg's straight leg raising did improve to 70 degrees. (R. 433.) On March 9, 2010, Dr. Jindal replaced Lodine with Zanaflex 2 mg twice a day. (R. 431.) On August 9, 2011, her straight leg raising deteriorated to 60 degrees bilaterally. (R. 634.) On October 4, 2011, her right straight leg raising was 40 degrees and her left 60 degrees. (R. 633.)

diagnosed Illenberg with "traumatic discopathy at L4-L5 causing chronic pain" and "whiplash injury that resulted in chronic headaches."[12] (Id.) He recommended surgical intervention. (Id.) On a January 24, 2011 visit, Illenberg reported that:

> her low back has been extremely limiting to her. Any prolonged sitting, standing, or walking results in a marked increase in back pain with radiation to her buttocks and then a sense of numbness at times into the great toe bilaterally. She has very limited ability to interact with her children and to do the day-to-day activities that she needs to do as a mother.

(R. 591.)

On March 2, 2011, Dr. Kornel and his associate performed a lumbar arthoplasty, L4-5 operation on Illenberg at Northern Westchester Hospital. (R. 599.) In an April 11, 2011 follow-up appointment, Dr. Kornel wrote that Illenberg "has no significant pain at all. She gets occasional back pain that is brief and not severe, but most of the time she is without pain." (R. 590.) On December 5, 2011, Dr. Kornel found that Illenberg was doing well overall, although changes in weather gave Illenberg backaches. (R. 589.) Illenberg also reported being under a lot of stress and being "very active" because her grandmother is sick, and she is taking care of two households as a result. (Id.)

### 7.    Dr. Srinivas Bonthu, MD Imaging

On June 25 and July 21, 2009, Dr. Srinivas Bonthu of MD Imaging conducted MRIs and reported his findings to Dr. Jindal. (R. 454, 610, 615.) On June 25, 2009, Dr. Bonthu found that at "C5-C6, there is slight loss of signal in the intervertebral disk" but no significant building. (R. 615.) On July 21, 2009, Dr. Bonthu found a "herniated disk with resultant narrowing of the

---

[12] On October 21 and November 10, 2010, Illenberg saw Dr. Poescion, at Dr. Ezriel Kornel's referral, for a discography procedure at L3/4, L4/5, and L5/SI. Illenberg then followed up with Dr. Kornel. (R. 617-19.)

central canal and neural foramina at L4-L5."(R. 610-11.) On October 13, 2010, Dr. Bonthu

conducted MRIs and reported his findings to Dr. Ezriel Kornel. (R. 607-09.) Dr. Bonthu found

"disk herniation with resultant stenosis at L4-L5." (R. 608.)

## III. The Administrative Hearing for 2009 Application

### A. August 8, 2011 Administrative Hearing

On August 8, 2011, Illenberg appeared with counsel at a hearing before ALJ Michael A.

Rodriguez. (R. 32.) The hearing was adjourned due to confusion with regards to Illenberg's

previous application(s) to the SSA. (R. 35-37.)

### B. May 24, 2011 Administrative Hearing

On May 24, 2011, Illenberg appeared with counsel at a hearing before ALJ Roberto

Lebron. (R. 39.) Illenberg testified that she was 30 years old and had been separated from her

husband for seven years. (R. 42-43.) She lived in an apartment in Beacon, New York, with her

fiancé and their child. (R. 43). She graduated from high school and her last employment was

with Rite Aid. (R. 44.) Illenberg testified that she stopped working at Rite Aid on January 15,

2005, the onset of her disability, because "my concentration level isn't . . . the best. And I have a

hard time dealing with the public. [And] I have really bad social anxiety." (R. 45-46.) She also

testified that she had an artificial disc in her back. (R. 46.) Illenberg testified that she worked at

Rite Aid, stocking shelves and as a cashier, for a month or two. (Id.) Before that, she had worked

in retail and fast food – at places like Wendy's, Arby's, the Bon Ton, and Old Navy. (Id.) None

of the jobs was of long duration. (R. 47.)

Illenberg testified that she is unable to work because of her depression, lower back pain,

and migraines: "Some days all I can do is sleep and I can't even get out of bed. And the same

thing with the pain, some days are – I can't even get out of bed in the morning to get up to do my

14

normal activities, let alone anything else." (R. 47-48.) To treat these conditions, Illenberg

testified that she was in physical therapy. She has a back brace and a TENS unit, which relieves

pressure in her neck, both of which were prescribed to her by Dr. Hansraj at New York Spine

Surgery. (R. 50.) Illenberg also had surgery consisting of lumbar arthoplasty for an L4 and L5 at

Northern Westchester Hospital by Dr. Kornel in March 2011. (R. 51-52.) Illenberg testified that

she sees Dr. Kornel and Dr. Jindal monthly for her back pain and takes Vicodin. She also sees

Dr. Chung, who prescribes her Abilify, BuSpar, Remeron, Ambien, and Klonopin for her

psychiatric needs. (R. 53.) Thereafter, the hearing was adjourned because the ALJ was missing

doctors' reports.

### C.   February 17, 2012 Administrative Hearing

On February 17, 2012, Illenberg appeared with counsel at a hearing before ALJ Michael

A. Rodriguez. (R. 58-122.) At the hearing's outset, due to continued omissions in the record, the

ALJ granted a 30-day period of post-hearing development to ensure that the record was complete

before deciding the case. (R. 61-65.)

### 1.   Illenberg's Argument Regarding *Res Judicata* of Earlier Claims.

Illenberg's counsel argued that *res judicata* does not bar the current SSD application

because it is not the same facts and circumstances that were before Judge Patane in 2009. First,

Illenberg's physical ailments were not put in issue at that hearing. (R. 68-69.) Second, the

psychiatric records of Dr. Malvaroso were never obtained, and thus never considered.[13] (R. 68-

72.)

---

[13] At the hearing, Illenberg's attorney stated that although Dr. Malvaroso's psychiatric records were never part of the 2009 record before Judge Patane, they "[a]re in this record." (R. 69.) After thorough review of the administrative record, however, the Court has been unable to locate Dr. Malvaroso's reports.

### 2.      Illenberg's Testimony Regarding her Mental and Physical Health

Illenberg testified that she has three children: ages twelve, eight and three. (R. 73.) She is separated from her spouse but lives with her youngest daughter and her significant other of seven years, John. John is currently unemployed but was formerly a clinical counselor for drug and alcohol users. Her mother has custody of the two older children, but she is allowed to see them alone. (R. 73-74.) The oldest child is the daughter of her separated husband, and the son's father is a different man, Michael. The separated husband does not financially support or see their child, but Michael does provide Illenberg's mother financial support for his child. (R. 73-75.) Illenberg gets food stamps and is on Medicaid. (R. 104.)

Illenberg testified that she has been clean and sober for six years. (R. 76.) She voluntarily completed the Turning Point treatment program, attends AA and NA, and has a good relationship with her sponsor. (R. 77.) She smokes five cigarettes a day. (R. 110.) Due to the medications she is on and her physical limitations, she currently weighs 217 pounds, which she stated was more than her ideal weight. She stated that both her mental and physical symptoms contribute equally to her disability. (R. 97.)

With regards to her physical impairments, Illenberg testified that in July of 2007, she was a passenger in a car that was in an accident. (R. 78.) She was released from the emergency room the same day and referred to Orthopedic Associates. (Id.) She was not diagnosable at the time because she was pregnant and could not be x-rayed. (R. 79.) Thereafter, she was placed on bed rest for most of her pregnancy. (R. 80.) After her youngest child was born on February 19, 2008, she took x-rays. The MRIs showed that Illenberg had a couple of herniated discs and arthritis in her spine. (R. 82.) She described her symptoms as "lower back pain across my whole lower back, down into my hips and sometimes going into my legs and feet to the point where I can't get up."

(Id.) Illenberg explained that the doctors first recommended physical therapy, then more aggressive physical therapy, then pain medicine, and eventually epidural steroid injections – none of which worked. (R. 83.) She took Vicodin for the pain, but it did not lower the pain level enough to enable her to function. (R. 84.) In March of 2011, she had surgery. At her last visit with her surgeon in December 2011, Dr. Kornel thought the surgery was a success and that she was doing better. (R. 97-98.) Illenberg testified, however, that the surgery did not improve her symptoms: "I can't even get in and out of a bath tub by myself. . . . I still can't sit and stand for long periods of time. I can't even lay down for a long period of time without getting uncomfortable or hurting." (R. 84-86.) Because Illenberg cannot lower to the floor to play with her daughter, her friends Julie and Ashley come over to help. (R. 86.) Illenberg stated that the pain in her back extends into both sides of her legs, but more so on her left. She sometimes needs help bending over to tie her shoes. (R. 108.) She testified that her doctors have not yet recommended more surgery or more injections. (R. 87.) She did just have nerve testing, and she has resumed going to physical therapy two times a week. (R. 88.)

When the ALJ questioned Illenberg on why she had not told the previous ALJ at her first hearing about her back pain, she responded "I wasn't really thinking." (R. 85.) She explained, however, that she is "always in pain" and at that time, her symptoms were the same as they were currently. (Id.)

With regards to her mental health, Illenberg testified that in the past, she had "breakdowns," "hysterical crying for no reason," and threatened to kill her separated husband. (R. 89.) When admitted to Cornwall Hospital in September 2005, she was using illegal substances, although she claimed she was not high at the time. (R. 90.) She had not been admitted to a hospital for mental health issues since finishing rehabilitation at Turning Point.

17

(Id.) She testified that she sees a psychiatrist, Dr. Chung, once a month, and a case manager two or three times a month. (R. 91.) She still has headaches daily. (R. 109.) She takes Abilify, Klonopin, Lunesta, Remeron, Naproxen (a pain reliever for arthritis), Flexeril (for muscle relaxation), and Fioricet (for migraines). She had been switched off BuSpar to Klonopin and off Ambien to Lunesta. The drugs, however, only help minutely. (R. 91-94.)

Illenberg testified that she still has "bad days" at least twice a week and cannot remember a period in the last five years where she did not have these mood swings. (R. 99.) Asked to describe her bad days, she responded,

> I can't bring myself to get up out of bed. . . . [A]ll I want to do is cry. I don't want nobody to – I don't want to talk to nobody, I don't want nobody touching me, coming – I don't want nothing to do nothing. I don't even want to see my children.

(R. 94, 99, 101-04.) In terms of her physical health, she testified, "a good day would be where my pain would be under a five, from the scale of one to ten. And my bad days are usually like an eight or nine." (R. 100.) She continued,

> On a good day I get up out of bed. I take care of my – well, the child that's with me, or if my other kids are at the house, I'll like get up, cook for them. Do as much as I can without hurting myself . . . . And I can only last for so long and then once I'm – when I feel myself starting to – the pain starting to rise a little bit more, that's when I go, I lay down or I take my pain medication or whatever the case may be.

(R. 101.) There are days, however that she spends the whole day in bed. (R. 104.)

In response to being questioned about things she likes to do, Illenberg stated that she likes to go to Church, but she sits by the door so that she can walk out if she starts feeling a panic attack coming. (R. 106.) She recently went to get her nails done, but she had to get up during the

process. (Id.) She likes to go to drive-thrus and shop at Walmart, but only in off hours so there are not many people around. (R. 107-08.)

With regards to her vocational capabilities and history, Illenberg testified that she has worked full time as a cashier in a floral shop, in retail, clothing stories, and fast food restaurants. (R. 111.) At a Rite Aid, she stocked shelves in addition to performing cashier duties. (R. 111-12.) She was a driver for Advanced Auto Parts and worked the "fish game" at a carnival for three years. (R. 112-13.) She also waitressed at Denny's, but she did not like the atmosphere. (R. 114.)

### 3.  Vocational Testimony

Donald Slive, a vocational expert, testified at the hearing. He did not, however, review documents and exhibits bearing on Illenberg's work experience because the disc he had received bearing that information was corrupt. (R. 110-11.) As a result, the ALJ examined Illenberg further regarding her vocational history. See supra.

The vocational expert first summarized Illenberg's past work experience. (R. 115-16.) The ALJ then asked the vocational expert to assume an individual with residual functional capacity of sitting six hours of an eight hour day, standing and walking two out of the eight hours with an option to sit or stand exercisable at will, and ability to lift and carry limited to 10 pounds. The individual could not push or pull, use ropes, ladders, scaffolds, stairs or ramps; could do occasional balancing and stopping, but no kneeling, crouching, or crawling; would need to avoid extreme temperatures, humidity and witness, and hazards such as moving machinery and heights; and could have occasional interaction with the public and frequent work-related interactions with co-workers, but the job should deal more with things than people. The individual should be limited to unskilled, low stress jobs, with only occasional decision making and exercise of judgment in job performance. (R. 116-17.) The vocational expert testified that such an individual

19

would not be able to perform any of Illenberg's past relevant work. Such a person could, however, perform the job of: final assembler, which is a sedentary unskilled job, and of which there are 3,420 jobs nationally and 328 regionally; preparer, which is a sedentary unskilled job, and of which there are 3,490 jobs nationally and 237 regionally; or stonesetter, which is a sedentary unskilled job, and of which there are 5,650 jobs nationally and 472 regionally. (R. 117-18.) The vocational expert clarified that these jobs were a representative, rather than exhaustive, list. (R. 118.)

The ALJ gave a second hypothetical in which the residual functioning capacity remained the same, but the individual would also require an additional amount of time to be off-task during the workday: up to 15% of the workday in increments as little as five minutes. The 15% would be in addition to regularly scheduled work breaks and lunch, and would not require prior supervisory approval. The individual would also miss two full days of work on a monthly basis. (R. 118.) The vocational expert testified that no jobs satisfy such a hypothetical individual.

## IV.    The ALJ's Determination

The ALJ issued his decision on May 8, 2012. He concluded that Illenberg had not been under a disability, either physical or mental, within the meaning of the Act since January 10, 2010, the date the application was filed. Therefore, the ALJ denied Illenberg's claim for DIB, because *res judicata* barred the claim, and her claim for SSI, because she was not disabled under the Act. On September 24, 2013, the Appeals Council denied Illenberg's request for review, thereby rendering the decision of the Commissioner final.

At step one, the ALJ determined that Illenberg had not engaged in "substantial gainful activity." At step two, the ALJ found that Illenberg had the following severe impairments: degenerative disc disease of the lumbar and cervical spine with radiculopathy; obesity; a

20

depressive disorder; a panic disorder with agoraphobia; and polysubstance dependence in remission. At step three, however, the ALJ found that Illenberg's severe impairments did not meet or medically equal any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). With regards to her disc disease, the ALJ concluded that there was no documentation supporting a finding of Disorders of the Spine within Listing § 1.04A. With regards to her mental health impairments, the ALJ concluded that there was similarly no objective showing of restrictions under the four Part B psychiatric review technique form categories[14] that satisfy mental impairments under Listing § 12.00.

Before continuing to step four of the analysis, the ALJ assessed Illenberg's residual functional capacity ("RFC"), which evaluates a claimant's exertional limitations. The ALJ concluded that Illenberg had the RFC to perform a range of unskilled, low-contact, low-stress, sedentary work with the following restrictions: (1) limited to lifting and carrying up to 10 pounds; (2) limited to standing and/or walking for up to two hours, and sitting for at least six hours, in an eight hour workday; (3) the ability to alternate between sitting and standing at-will; (4) limited to balancing and/or stooping occasionally but no significant pushing or pulling, kneeling, crouching, crawling, or climbing of ropes, ladders, ramps, or scaffolds; (5) the ability to avoid moderate or greater exposure to temperature extremes, wetness, and humidity; and (6) limited to no more than occasional interaction with the public or frequent co-worker interaction.

---

[14] A psychiatric review technique form ("PRTF") is completed by an SSA mental consultant as part of evaluating a claimant's mental impairment. The form rates a claimant in four categories: (1) whether the claimant has a medically determinable impairment, (2) whether the claimant's condition is severe, (3) whether the claimant's condition is severe but unlikely to last 12 months or longer, and (4) whether the claimant's condition is severe enough to meet or equal a listing in the Listing of Impairments. See 20 C.F.R. 404.1520a, 416.920a.

The ALJ based his determination on the treatment reports of Drs. Jindal and Kornel, and the records from Dr. Chung.

The ALJ then provided a summary of the objective medical evidence. Regarding Illenberg's mental health, the ALJ found that the evidence reflected a depressive disorder, panic disorder with agoraphobia, and a history of polysubstance abuse.[15] He concluded, however, that the conditions resulted in "a mild limitation of claimant's ability to conduct her activities of daily living and moderate restrictions in terms of social functioning and concentration, persistence, and pace." (R. 25.) The ALJ based this conclusion on Illenberg's ability to care for two households simultaneously; her difficulty being in crowds but ability to attend church; an assessment of low-average cognitive ability but intact recent/remote memory and consistently unimpaired orientation; and the lack of any inpatient psychiatric hospitalizations (other than for substance abuse treatment). (R. 26.) He also determined that there were no episodes of decompensation.

To assess the credibility and depth of Illenberg's statements about pain and other symptoms, the ALJ next applied a two-step analysis: (1) he determined whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce Illenberg's symptoms; and (2) he evaluated the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent they limit the claimant's functioning. (R. 26-27.) Although the ALJ found that Illenberg's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he determined that her statements concerning the intensity, persistence, and limiting effects were not credible. The ALJ noted that although Illenberg asserts that her back pain has remained constant in magnitude from her accident through her hearing, she failed to raise any physical complaints at her previous

---

[15] See 20 C.F.R. Part 404, subpt. P, app'x 1 §§ 12.04, 12.06, 12.09.

disability hearing held on February 26, 2009, which was closer in time to her July 2007 car accident. The ALJ also found that Illenberg's allegation that her spinal symptoms have not improved post-operation contradict Dr. Kornel's 2011 reports that state that Illenberg's back pain was better and at most intermittent. (R. 27.) The ALJ gave "substantial probative weight" to Dr. Kornel's reports, as he was an attending specialist who had developed a longitudinal treatment history with Illenberg.

Concerning the intensity, persistence and limiting effects of her symptoms, the ALJ also relied on the "primarily conservative" treatment recommended by Dr. Jindal. Because Dr. Jindal's reports indicate that Illenberg had intact neurological functioning but for some upper extremity paresthesia, no gait abnormalities, and was in no acute distress, the ALJ determined that Illenberg's symptoms do not amount to total disability. The ALJ also considered Illenberg's obesity but found it did not add to the functional compromise already accounted for in her RFC based on her neurological functioning and normal gait.

With respect to her daily living, the ALJ determined that Illenberg was "fully independent in all aspects of her self-care, including showering, grooming and dressing. She can cook, clean, launder, and shop. She is the primary caregiver for her youngest daughter . . . . She maintains a relationship with her significant other; and she is chronicled as taking care of two households simultaneously before her grandmother's death. (R. 26.)

At step four, the ALJ found that Illenberg was unable to perform any past relevant work given her limitations. (R. 28.) At step five, considering Illenberg's residual functional capacity, age, education, and work experience in conjunction with the Medical Vocational Guidelines, the ALJ concluded, however, that there were representative occupations – such as final assembler, preparer, and stone setter – that Illenberg could perform. (R. 29.) This determination was made

in reliance on the vocational expert's testimony that, given the limitations set forth in Illenberg's residual functioning capacity, she could perform certain unskilled jobs, with sedentary exertional levels, which are available in the national and regional economy. Consequently, the ALJ found Illenberg "not disabled" as defined in the Act.

## DISCUSSION

### I.   Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Dargahi v. Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010) (citation omitted). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). See also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.") This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the

Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Soc. Sec'y Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and internal quotation marks omitted; emphasis in original)).

Though generally entitled to deference, an ALJ's disability determination must be reversed or remanded if it is not supported by "substantial evidence" or contains legal error. See Rosa, 168 F.3d at 77. Thus, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD) 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citing Reyzina v. Apfel, 98 Civ. 1288 (JG), 1999 WL 65995, at *13 (E.D.N.Y. Feb. 10, 1999)). Without doing so, the ALJ deprives the Court the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.")

## II.    Legal Standard

### A.    Definition of Disability

A claimant is disabled under the Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A

determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairment(s) are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the Social Security Administration has established a five-step sequential evaluation process when making disability determinations. See 20 C.F.R. § 404.1520. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to prior work that the burden shifts to the

Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her RFC, age, education, and past relevant work experience. 20 C.F.R. § 404.1560(c)(2); Melville, 198 F.3d at 51.

If an impairment is found to be "severe" at step two, the ALJ looks to 20 C.F.R. Part 404, Subpart P, App'x 1 to determine if the impairment qualifies as a listed mental disorder at step three. 20 C.F.R. § 404.1520a(d)(2). The Regulations provide additional guidance for evaluating mental impairments. 20 C.F.R. § 404.1520a(c)(1). Calling it a "complex and highly individualized process," the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c)(2). For mental disorders, a claimant must show in part that she has at least two of the so-called "paragraph B criteria" or the "paragraph C criteria." The paragraph B criteria require at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintain concentration, persistence, or pace; and (4) repeated episodes of decompensation. 20 C.F.R. Part 404, subpt. P, app'x 1 § 12.04(B). The first three are rated on a "five-point scale:" none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The last area – episodes of decompensation – is rated on a "four-point scale:" none, one or two, three, and four or more. Id. The paragraph C criteria require: (1) repeated episodes of decompensation, each for extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with

an indication of continued need for such an arrangement. 20 C.F.R. Part 404, subpt. P, app'x 1 § 12.04(B).

**B.      Treating Physician Rule**

The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well supported by medical findings and is not inconsistent with the other evidence in the record. 20 C.F.R. § 404.1527(c)(2). Affording a treating physician's opinion controlling weight "reflects the reasoned judgment [that treating physicians are] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. 20 C.F.R. § 404.1527(c)(2). In this Circuit, the rule is robust. The ALJ cannot discount a treating physician's opinion unless the ALJ believes that it "lack[s] support or [is] internally inconsistent." Duncan v. Astrue, 09 Civ. 4462 (KAM), 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011). See also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."). See, e.g., Rivera v. Comm'r of Soc. Sec'y, 728 F. Supp. 2d 297, 327 (S.D.N.Y. 2010) (finding remand was inappropriate where the ALJ validly rejected the treating physicians' opinions because they conflicted with plaintiff's admitted daily activities and other evidence in the record). A report by a consultative physician may constitute substantial evidence when the treating physician's opinion is inconsistent with other substantial evidence in the record. Guzman v. Astrue, 09 Civ. 3928 (PKC), 2011 WL 666194, at *9 (S.D.N.Y. Feb. 4, 2011).

If the ALJ decides to discredit the opinion of a treating physician, the ALJ must follow a structured evaluative procedure, considering the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 416.927(c)(2)-(6). This process must be transparent. The regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Where an ALJ does not credit a treating physician's findings, the claimant is entitled to an explanation. Snell, 177 F.3d at 134.

The decision on the ultimate issue of disability, however, is one reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(2); see Snell, 177 F.3d at 133 ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative.")

**III.   Analysis**

On appeal to this Court, Illenberg argues that (1) substantial evidence does not support the ALJ's RFC assessment because (a) the ALJ did not properly evaluate Illenberg's treating physician's opinion, and (b) the ALJ failed to credit Illenberg's testimony properly; and (2) the ALJ erred in determining that Illenberg is capable of performing jobs which exist in significant number in the national economy. While the Court will analyze these claims in turn, it also reviews the entirety of the ALJ's decision to ensure that it is free of legal error and supported by

substantial evidence. On review, the Court finds that the ALJ's determination is supported by substantial evidence and contains no legal error.

### A.      Steps One and Two

At step one, the ALJ determined that Illenberg has not been engaged in "substantial gainful activity." (R. 25.) At step two, the ALJ found that Illenberg had the following severe impairments: degenerative disc disease of the lumbar and cervical spine with radiculopathy, obesity, a depressive disorder, a panic disorder with agoraphobia, and a polysubstance dependence in remission. (R. 25.) This list of severe impairments is narrower than the list of disabilities alleged by Illenberg, which included arthritis and bipolar disorder. The Court, however, finds little medical evidence to support an arthritis disability other than Illenberg's own testimony at trial regarding the purpose of medications. (R. 82-92.) And, although Illenberg repeatedly referred to a past diagnosis of bipolar disorder throughout her medical history, there is no medical evidence in the record giving her such a diagnosis either. (See R. 373, 386-93, 563-68.) Because the ALJ's determinations at steps one and two do not negatively affect Illenberg's application for benefits, and because she does not challenge these conclusions, the Court will not address them. The Court finds, however, based on a review of the Administrative Record, that the ALJ's determination as to substantial gainful activity and Illenberg's severe impairments is supported by substantial evidence.

### B.      Step Three

At step three, the ALJ determined that Illenberg's severe impairments or combination of impairments did not meet or medically equal the severity of the listed impairments. (R. 25.) Although Illenberg does not challenge the ALJ's conclusion at step three, the Court finds that the ALJ's determination is supported by substantial evidence and free of legal error.

When the ALJ makes an adverse finding at step three, the ALJ "must justify this determination with more than a brief, conclusory statement that the plaintiff's conditions do not 'meet[ ] or equal[ ] one of [the] listings in appendix 1 to subpart P of part 404.'" Rivera, 2012 WL 3614323 at *11 (citing 20 C.F.R. § 416.920(a)(4)(iii)). Even in the absence of specific rationale, however, the Court may look to "other portions of the ALJ's detailed decision, along with plaintiff's own testimony" to find that substantial evidence supports the ALJ's determination. See Salmini v. Comm'r of Soc. Sec'y, 371 F. App'x 109, 112-13 (2d Cir. 2010). With regards to her degenerative disc disease the ALJ concluded, "there is no documentation of any significant motor, sensory, or reflex deficits" as required by Listing § 1.04A. (R. 25); 20 C.F.R. Part 404, subpt. P, app'x 1 § 104(A). Later in his opinion, the ALJ noted that Dr. Kornel's 2011 reports "chronicle at most intermittent and non-severe backaches." (R. 27.) He referred to Dr. Jindal's reports, which document "intact neurological functioning [ ] save for some upper extremity paresthesia" and "no gait abnormalities." (Id.) And he also found that Illenberg "remained quite active with respect her activities of daily living" based on her ability to maintain self-care, care for her daughter, and "tak[e] care of two households" simultaneously. (Id.)

Next, grouping together the severe impairments of depressive disorder, panic disorder with agoraphobia, and a polysubstance dependence in remission,[16] the ALJ concluded, "[t]here is similarly no objective showing of marked restrictions in any of the four Part B psychiatric review technique form (PRTF) categories that are applicable to mental impairments as contained in section 12.00 of the listings." (R. 25.) Explaining that the paragraph B and C criteria were not met, he noted: '[t]hese conditions have resulted in a mild limitation of the claimant's ability to

_____

[16] Because the listing for substance addiction disorders does not take into account polysubstance dependence *in remission*, the Court finds there is substantial evidence to support the ALJ's finding and does not address this conclusion further. See 20 C.F.R. Part 404, subpt. P, app'x 1 § 12.09.

conduct her activities of daily living; and moderate restrictions in terms of social functioning and concentration, persistence and pace. There have been no episodes of decompensation shown within the objective medical evidence record." (R. 26.) The ALJ based this conclusion on Illenberg's ability to care for two households simultaneously; her difficulty being in crowds but ability to attend church; an assessment of low-average cognitive ability but intact recent/remote memory and consistently unimpaired orientation; and the lack of any inpatient psychiatric hospitalizations (other than for substance abuse treatment). (Id.) The ALJ also found that, rather than requiring a highly supportive living arrangement, Illenberg was "quite active with respect to her activities of daily living" and "fully independent in all aspects of her self-care." (Id.)

## C.   Illenberg's RFC

Before proceeding to step four, which requires an ALJ to determine whether the claimant can perform her past work, the ALJ must determine the claimant's RFC. An RFC determination indicates "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). To determine a claimant's RFC, an ALJ must consider the claimant's physical and mental impairments, symptoms and pain, and all of the relevant medical and other evidence. Id. Illenberg contends that the ALJ's RFC finding is not supported by substantial evidence in the record because the ALJ (1) did not evaluate Illenberg's treating physician's opinion properly or properly evaluate all of the medical evidence in the record; and (2) failed to credit Illenberg's testimony properly. (Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Pleadings, dated June 12, 2014 ("Pl's Mem.") at 10-15.)

### 1.   Treating Physician Doctrine and Medical Evidence

The ALJ based the limitations and requirements of Illenberg's RFC on the treatment reports of Drs. Jindal and Kornel, as well as those of Hudson Valley Mental Health Clinic. In

referencing these three providers, it is clear to the Court that the ALJ considered these to be

Illenberg's "treating physicians." Illenberg does not appear to take issue with the ALJ's

deference to Dr. Jindal's reports or those of Dr. Chung at Hudson Valley as treating physicians'

opinions. (Pl's Mem. at 11-12.) Instead, she alleges that the ALJ erred in giving "substantial

probative weight," rather than "controlling weight," to Dr. Kornel's reports and in crediting some

of Dr. Kornel's findings more than others. (Id.)

Contrary to Illenberg's argument, because there are numerous treating physicians in this

case, the ALJ was not necessarily required to give any one of their opinions "controlling

weight." See Snell, 177 F.3d at 133. In Snell v. Apfel, the Court of Appeals for the Second

Circuit found that two physicians, but not a third, were treating physicians but held that their

opinions should not be controlling. Id. at 133-34. Because the record contained evidence from

other, consulting physicians who made less favorable findings, the treating physicians' opinions

were "inconsistent with the other substantial evidence" and not due controlling weight. Id. (citing

20 C.F.R. § 404.1527(d)(2)). Applying that analysis here, the Court finds that although it is not

clear that the ALJ afforded Dr. Kornel's opinions less than controlling weight, to the extent that

he did, it was within his province to do so.

The ALJ relied on Dr. Kornel's opinion that Illenberg's March 2011 back surgery

achieved its goal of significant pain alleviation. (R. 27.) Contrary to Illenberg's allegations, no

medical reports in the record indicate that her back pain had not improved following the surgery:

in fact, the vast majority of doctors' reports were taken before her 2011 back surgery. Other than

Dr. Kornel's follow-up reports, the only other reports that are dated after Illenberg's surgery are

four reports from Dr. Chung, dated April 14, 2011, July 4, 201, October 12, 2011, and January 9,

2012. (R. 541-48, 655-78). In those visits, there are notations citing only Illenberg's plan to have,

and then having had, back surgery, and there is no mention of back pain at all in the January 9, 2012 report. Further, at her April 11, 2011 visit, Dr. Kornel found that "most of the time [Illenberg] is without pain," and at her December 5, 2011 visit, he found that she was doing well overall, although changes in the weather gave her backaches. (R. 589-90.) Although Dr. Kornel did mention that Illenberg was having chronic headaches, he also noted that she has been "very active" due to taking care of two households. (Id.) Significantly, there was no other place in the record – not in Dr. Chung's, Dr. Jindal's, or Dr. Celestin's reports – other than Illenberg's own testimony, that evidence chronic migraines as an ongoing impairment. There also was no indication that the psychological stressors Illenberg was then experiencing were anything other than temporary.

The ALJ found it significant that Dr. Jindal characterized Illenberg's need for orthopedic treatment as "primarily conservative in nature." (R. 27.) He referenced that Illenberg had no psychiatric hospitalizations and exhibited consistently unimpaired orientation. (Id.) Although Illenberg was hospitalized in the past, the ALJ found that she goes to church, is interested in pursuing job training, and has a "pleasant, normal gait and posture, good eye contact, friendly, [and] answers all relevant questions." (R. 396)

Other evidence in the record supports the ALJ's determination. The opinions of Dr. Steven Celestin, who also appears to have a treating physician relationship with Illenberg, are not inapposite to the ALJ's conclusion. Dr. Chung's opinions also note that Illenberg did venture out over the holidays and to get her nails done. (R. 106, 655.) Although the ALJ failed to refer to Illenberg's GAF assessments in his decision, the GAF assessments do not necessarily contradict the ALJ's finding in light of all the evidence in the record.

Under the treating physician's rule, it is "within the province of the ALJ" to resolve conflicts in the medical evidence in light of all evidence in the record. Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Micheli v. Astrue, 501 F. App'x 26, 29-30 (2d Cir. 2012) ("[B]ecause it is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record where the record provides sufficient evidence for such a resolution, the ALJ will weigh all of the evidence and see whether it can decided whether a claimant is disabled based on the evidence he has, even when that evidence is internally inconsistent."). When a treating physician's opinion is internally inconsistent or inconsistent with other substantial evidence in the record, the ALJ may give the treating physician's opinion less weight. Snell, 177 F.3d at 133 (2d Cir. 1999). See also Micheli, 501 F. App'x at 28 ("A physician's opinions are given less weight when his opinions are internally inconsistent.") (citing Michels v. Astrue, 297 F. App'x 74, 75 (2d Cir. 2008)); Halloran, 362 F.3d at 32 (holding that a treating physician's opinion may not be afforded controlling weight where it is not consistent with other substantial evidence in the record); Veino, 312 F.3d at 588 (where "the record plainly contained conflicting psychological evaluations of [the claimant's] present condition, . . . it was within the province of the ALJ" to accept portions of a doctor's opinion while rejecting other portions).

Here, the ALJ relied on Dr. Kornel's opinions while considering other physicians' opinions, as well. The record itself is voluminous and his review of all the evidence in it was thorough. That the ALJ weighed the evidence and reached a different conclusion than Illenberg, or another factfinder, might have reached does not establish legal error. He simply was not required to afford every mention of Illenberg's back pain or migraines controlling weight. Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not

perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). The Court is bound to uphold the ALJ's conclusion because "a reasonable factfinder would [not] *have to conclude otherwise*." Brault, 683 F.3d at 448 (emphasis in original) (citation omitted); McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted).

Lastly, the Court notes that the medical records in this case are quite extensive. Even so, the record lacks any opinion from Illenberg's physicians specifically referencing the degree to which her impairments prevent her from working. In some cases, courts have remanded where, as part of a duty to develop the record, the ALJ failed to obtain a physician's opinion on a claimant's remaining capabilities. See, e.g., Rosa, 168 F.3d at 79-80 (holding that ALJ failed to fully develop the record by neglecting to seek information or explanation to supplement treating physician's "sparse" notes which were "conclusive of very little"); Moreira v. Colvin, 13 Civ. 4850 (JGK), 2014 WL 4634296, at *6 (Sept. 15, 2014) (remanding where the ALJ was "[f]aced with ambiguities, inconsistencies, or gaps in a treating physician's reports" and failed to obtain the treating physician's opinion as to the claimant's ability to perform work); Connor v. Barnhart, 2 Civ. 2156 (DC), 2003 WL 21976404, at *5 (S.D.N.Y. Aug. 18, 2003) (holding that, with a *pro se* claimant, "the ALJ must obtain the treating physician's opinion regarding the claimant's alleged disability; raw data or even complete medical records are insufficient by themselves to fulfill the ALJ's duty") (internal citations and quotation marks omitted). In these cases, however, the claimant was either *pro se* or the medical evidence was sparse − neither of which is the case here. Further, "remand is not always required when an ALJ fails in his duty to

36

request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." Tankisi v. Comm'r of Soc. Sec'y, 521 F. App'x 29, 34 (2d Cir. 2013) (citations omitted); Arboleda ex rel. L.M.R. v. Colvin, 12 Civ. 3987 (LGS)(HBP), 2014 WL 5786948, at * 3 (S.D.N.Y. Nov. 6, 2014) (citing same). Based on the extensive medical records of Illenberg's treating physicians, the ALJ's RFC determination is supported by substantial evidence even if there is some evidence to support Illenberg's position, as well.

### 2. Credibility

Illenberg next asserts that the ALJ improperly assessed her credibility in making his RFC determination. (Pl's Mem. at 13.) It is the ALJ's role to evaluate a claimant's credibility and to decide whether to discredit a claimant's subjective estimate of the degree of impairment. Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999). See also 20 C.F.R. § 416.929(b) (dictating than an individual's subjective complaints alone do not constitute conclusive evidence of a disability). If a claimant alleges symptoms of greater severity than established by the objective medical findings, the ALJ should consider other evidence, including factors such as the claimant's daily activities, the location, nature, extent, and duration of her symptoms, precipitating and aggravating factors, the type, dosage, effectiveness and side effects of medications taken, and other treatment undertaken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi); 20 C.F.R. § 416.929(c)(3). When ruling on credibility, the ALJ must then take all pertinent evidence into consideration and provide "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p. See also Cruz v Colvin, 12 Civ. 7346 (PAC)(AJP), 2013 WL 3333040 (S.D.N.Y. July 2, 2013). On appeal, an ALJ's credibility finding is entitled to deference and will be set aside only if it is not set forth "with sufficient specificity to enable [a

reviewing court] to decide whether [it] is supported by substantial evidence." Ferraris, 728 F.2d at 587; see Gernavage v. Shalala, 882 F. Supp. 1412, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded [to] the ALJ's [credibility] determination because [the ALJ] heard plaintiff's testimony and observed [plaintiff's] demeanor.")

In defining Illenberg's RFC, the ALJ accounted for Illenberg's limitations with regard to physical exertion, her need to alternate between sitting and standing at-will, her sensitivity to changes in temperature, her need for limited interaction with the public and co-workers, and required that she deal "primarily with objects rather than people." (R. 27.). This shows that the ALJ did not completely disregard the medical evidence and her testimony as to her pain and suffering. Ultimately, however, the ALJ concluded that although Illenberg's impairments could reasonably be expected to cause her symptoms, her statement about the symptom's intensity, persistence, and limiting effects were not credible in light of all the evidence. In support of this conclusion, the ALJ first noted that Illenberg failed to raise any physical complaints concerning her back pain at her previous disability hearing held on February 26, 2009, which was more recent in time to her July 2007 car accident. (R. 27, 85.) He noted that at multiple physical examinations, Illenberg had intact neurological functioning and no gait abnormalities. (Id.) The ALJ also cited Dr. Kornel's reports that, since the back operation, Illenberg's symptoms have improved. (R. 27.)

With regards to her activities of daily living, he found that "[s]he is fully independent in all aspects of her self-care, including *showering*, grooming, [and] dressing. She can cook, clean, launder, and shop. She is the *primary caregiver* for her youngest daughter, who is currently about 4 years old. She maintains a relationship with her significant other; and she is chronicled as taking care of two households simultaneously prior to her grandmother's death." (R. 27

(emphasis added).) This statement errs by misconstruing some facts in the record. At the hearing, rather than indicating her ability to shower and take care of herself, Illenberg actually testified, "I can't even get in and out of a bath tub by myself." (R. 84-86.) Further, in a Hudson Valley report, Dr. Chung described Illenberg as "somewhat sloppy with poor hygiene." (R. 650.) On numerous medical reports from Hudson Valley, Illenberg also stated that, rather than being the primary caregiver of her daughter, her unemployed fiancé takes care of the child on a daily basis. (R. 541, 549.) Still, where the credibility determination does not turn on only these facts, and substantial evidence elsewhere in the record supports the ALJ's credibility finding, the Court defers to the ALJ's determination.

Significantly, while Illenberg is certainly limited by her impairments, the record also shows that Illenberg was able to go out over the holidays (R. 655); attends AA and NA and also has a good relationship with her sponsors (R. 77); has at least two close friends, Ashley and Julie, who help her with her child (R. 86); and went with a friend to get her nails done (R. 106). In addition, on October 13, 2009 and May 3, 2011, Illenberg told her primary care doctors that she had not suffered from having little interest or pleasure in doing things in the last two weeks and she was not feeling down, depressed, or hopeless. (R. 462, 530.) Therefore, although the ALJ made some factual errors in reaching his credibility finding, the Court finds that his further analysis regarding the rest of the medical evidence and consideration of other statements made by Illenberg support his determination. Accordingly, the Court concludes that the ALJ's RFC determination did not improperly disregard Illenberg's testimony. See, e.g., Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (finding "no reason to second-guess the [ALJ's adverse] credibility finding . . . where the ALJ identified specific record-based reasons for his ruling," and noting that "[n]o different conclusion is warranted by the ALJ's failure to reference specifically

[the plaintiff's] good work history, because substantial evidence aside from work history supports the adverse credibility ruling").

Lastly, Illenberg takes issue with the ALJ's reliance on her demonstrated ability to take care of two households simultaneously and to attend church services regularly despite reported difficulty being in crowds. (R. 26.) The Court agrees that in and of itself, these actions do not prove that Illenberg is capable of working. Balsamo v. Chater, 142 F.3d 75, 81-82 (2d Cir. 1997) ("When a disabled person gamely chooses to endure pain in order to pursue important goals,' such as attending church . . . , 'it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working.'") (quoting Nelson v. Bowen, 885 F.2d 45, 49 (2d Cir. 1989)). But where the ALJ considered these facts along with many others to determine, on balance, that the persistence, intensity, and functionally limiting effects of her symptoms were not as debilitating as she alleged, the Court finds that substantial evidence supports the ALJ's overall conclusion.

### D.       Steps Four and Five

Having found that Illenberg could conduct no past relevant work at step four, the burden of proof shifted to the Commissioner to establish that suitable work existed that Illenberg could perform and that existed in significant numbers (step five). Given her RFC, age, education, and work experience, the ALJ then concluded that there are jobs that exist in significant numbers in the national economy that Illenberg could perform. (R. 29.) Illenberg asserts that the ALJ erred in reaching this conclusion. (Pl's Mem. at 16-17.)

 "In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable [M]edical [V]ocational guidelines." Rosa, 168 F.3d at 78 (citation and internal quotation marks omitted). Those guidelines, known as "the Grids," take into account "the

claimant's residual functional capacity in conjunction with the claimant's age, education and skill level." Id. (citation and internal quotation marks omitted). If, however, a claimant has non-exertional limitations (which are not accounted for in the Grids), "the Commissioner must 'introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" Id. at 78 (quoting Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986)). An ALJ is entitled to credit the testimony of a vocational expert. Bavaro v. Astrue, 413 F. App'x 382, 384 (2d Cir. Mar. 14, 2011).

At the hearing, the ALJ introduced each of the potential limitations affecting Illenberg: (1) the need to stand and walk two out of eight hours a day with a sit-stand option exercisable at will; (2) limited to lifting or carrying up to 10 pounds; (3) no pushing and pulling, or use of ropes, ladders, scaffolds, stairs, or ramps; (4) occasional balancing and stooping, but no kneeling, crouching or crawling; (5) the need to avoid extreme temperatures, humidity, and wetness and hazards such as moving machinery or weights; (6) limited to occasional with the public and only frequent work-related interactions with co-workers; (7) that the job be object-, rather than people-, oriented; (8) off task fifteen percent of the workday in as little as five minute increments without supervisory approval; and (9) off two full days a month. (R. 116-17.) Considering all of these limitations, except for being off task and off two full days a month, the vocational expert was able to identify a non-exhaustive list of three jobs available in significant numbers in the national and regional economies. (R. 118.) Although Illenberg points out, and the Commissioner concedes, that one of the jobs, that of "preparer," actually does not meet the criteria, the Court notes that the vocational expert's list was only representative – and thus other jobs, in addition to the two remaining, exist that meet this criteria. (See Pl's Mem. at 17; Defendant's Memorandum

of Law in Support of Motion for Judgment on the Pleadings, dated June 12, 2014 ("Def's Mem.") at 25.)

While the vocational expert testified that being "off task" fifteen percent of the time and the ability to take off an additional two full days a month would prohibit an individual from working, the ALJ did not include these restrictions in Illenberg's RFC. Thus, assuming *arguendo* that the ALJ's RFC were supported by substantial evidence, then given the ALJ's reliance on the testimony of the vocational expert, the ALJ's determination at step five was supported by substantial evidence.

## CONCLUSION

Based on the evidence in the administrative record, the ALJ did not commit legal error and substantial evidence supports his determination. I recommend that the Commissioner's motion for judgment on the pleadings be GRANTED, that the plaintiff's motion be DENIED

\* \* \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the

chambers of the Honorable Analisa Torres at the U.S. Courthouse, 500 Pearl Street, New York,

New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a),

6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to

Judge Torres. The failure to file these timely objections will result in a waiver of those objections

for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 72(b); Thomas v.

Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge


DATED: New York, New York
          November 20, 2014